

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

ENTERED
05/14/2021

| | | |
|---|---|---|
| IN RE: | § | |
| **BARZAN HOSSEINI,** | § | **CASE NO: 18-20177** |
| Debtor. | § | |
| | § | **CHAPTER 13** |
| | § | |
| **ZEBA, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 19-2001** |
| | § | |
| **BARZAN HOSSEINI,** | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Mohammad Motaghi, the owner of Zeba, LLC ("Zeba"), filed this adversary proceeding against the Debtor, Barzan Hosseini ("the Debtor"), seeking a determination that a debt owed to Zeba is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6). Mr. Motaghi operated a check cashing business ("the Business") with the Debtor's father, Tom Hosseini. Mr. Motaghi claims to have funded the Business with an initial $80,000.00. It is unclear whether the $80,000.00 was an equity investment or loan. The Debtor was not involved in the formation of the Business, but frequently assisted his father with operating the Business. After the Business closed, Mr. Motaghi discovered that only about $15,000.00 remained in the Business bank account.

Mr. Motaghi accused the Debtor of absconding with the initial contribution and claims the Debtor accepted responsibility. The Debtor then executed a promissory note, secured by a deed of trust on the Debtor's family home, located at 3905 Keighley Crossing, Corpus Christi, Texas. The Debtor defaulted on the note and Mr. Motaghi initiated foreclosure proceedings. The Debtor filed a chapter 13 bankruptcy petition, and Zeba filed this adversary proceeding seeking a

determination that the note is excepted from discharge.  The Court held a trial on the matter and makes the following findings of fact and conclusions of law.

$14,650.00 owed to Mr. Motaghi is excepted from discharge.  That amount survives the bankruptcy as an unsecured, non-discharged claim.

## FINDINGS OF FACT

The Court's findings of fact are drawn from the testimony heard and evidence admitted at trial.  The Court heard testimony from both the Debtor and Mr. Motaghi.  Additionally, Michael Budd and Commander David Torres testified.  At the outset, the Court notes that the evidentiary record in this adversary proceeding is replete with holes and inconsistencies.  Mr. Motaghi and the Debtor's father formed the Business based on an oral agreement.  That agreement was never reduced to writing.  Nor was the Debtor's father available to testify.  Material chunks of the Business records were either not kept in the ordinary course, misplaced, or destroyed.  No bank account statements from the first months of the Business are in evidence.  Further, the Debtor plainly lied under oath.  That uncorroborated position of the Debtor's testimony will not be credited.  However, portions are amply corroborated and are accepted by the Court.  Mr. Motaghi likewise provided inconsistent testimony, but his inconsistencies appear to be based more on his unsubstantiated assumptions rather than on willful false testimony.

Mr. Motaghi owns and operates Snappy Foods convenience stores in the Corpus Christi area.  At times, Mr. Motaghi has operated check cashing businesses inside his convenience stores.  In early 2016, the Debtor's father approached Mr. Motaghi about opening a new check cashing venture.  The Debtor's father estimated that the Business could yield about $3,000.00-$4,000.00 in profits per month.  Mr. Motaghi agreed to form the Business, and agreed to capitalize the business with an $80,000.00 contribution.  It is unclear whether the partners viewed Mr. Motaghi's

contribution as a loan or an equity investment.  However, Mr. Motaghi testified that he expected to have the $80,000.00 returned after the Business concluded.  The Business opened in the spring or summer of 2016, and closed down in October 2017.

The Business was located at a kiosk inside a Snappy Foods store.  Customers would endorse checks to Zeba in exchange for cash in hand.  Every check that the Business handled received a Zeba, LLC stamp "for deposit."  The Business profited by collecting a fee which ranged from 1% to 1.5% of a check's value.  For example, a customer might endorse a $1,000.00 check to Zeba, in exchange for $990.00 or $985.00 cash, depending on the precise fee charged.  The Business would deposit that check into a Zeba account with Value Bank, making a $10.00 or $15.00 profit.

The bank account was held by Zeba.  Mr. Motaghi owns 60% of Zeba, and his wife owns the remaining 40%.  The Debtor's father had authority to make deposits and withdrawals from the account.

Mr. Motaghi did not involve himself with the day to day operations of the Business.  That was the Debtor's father's responsibility.  The Business cash and undeposited checks were stored in a safe in a back office of the Snappy Foods store.  Each morning, the Debtor's father would take cash out of the safe and place it in a register in the kiosk.  Each evening at closing time, both the remaining cash and all checks would be locked in the safe.  Approximately every other day, the Debtor's father would deposit the checks in the bank account, then withdraw enough cash to fund daily operations.  The Debtor's father kept logbooks detailing the Business' finances.

At the end of each month, the Debtor's father would calculate the monthly profits.  Mr. Motaghi and the Debtor's father would split the profits evenly.  Mr. Motaghi withdrew his share of the profits from the bank account.  The Debtor's father took his share in cash out of the register.

Mr. Motaghi testified that the Business was profitable every month, and that his profit share generally ranged between $1,000.00-$1,500.00 per month.

The primary risk of loss associated with the Business was bounced checks. If the Business deposited a check drawn on an account with insufficient funds, Value Bank would return the check. The Business would lose the face value of the check, and would be charged a fee by Value Bank. After a check bounced, Value Bank would notify Mr. Motaghi and send him an image of the check. Mr. Motaghi passed the information along to the Debtor's father, who would then attempt to track down the customer and collect the value of the check and any chargeback fees. Mr. Motaghi testified that the Debtor's father personally knew most customers. Mr. Motaghi suggested that those close customer relationships allowed the Debtor's father to reliably collect bounced checks.

Mr. Motaghi estimated that only ten to twelve checks bounced over the entire course of the Business. Further, he claimed that every bounced check was eventually collected in full. The evidence at trial demonstrated that his testimony was inaccurate. A review of the bank statements shows that twelve to thirteen checks bounced in the two-month period from January 2017 to February 2017 alone. This suggests that the total number of bounced checks far exceeded Mr. Motaghi's estimate. Mr. Motaghi's testimony vastly underestimated the total number of bounced checks. There was also no evidence that Mr. Motaghi monitored the collection status of any bounced check after he notified the Debtor's father. Mr. Motaghi merely assumed that the Debtor's father collected each bounced check.

Because Mr. Motaghi did not closely monitor the bank account or track the number and collection status of bounced checks, the Court declines to credit Mr. Motaghi's testimony that all bounced checks were collected.

Prior to the commencement of the Business, the Debtor's father suffered a stroke. According to the Debtor, the stroke impacted his father's ability to operate the business, including his father's ability to keep reliable accounting records. A review of the records introduced at trial shows that the accounting records and log books maintained by the Debtor's father were replete with errors. The Court does not know whether any of the errors were precipitated by deficiencies resulting from the father's stroke, although the Debtor implied that his father suffered substantial post-stroke deficits. The Debtor began assisting his father at the Business. The Debtor had no formal role or title, but helped his father with almost all aspects of the Business. As compensation, the Debtor's father gave part of his share of the monthly profits to the Debtor. When he began working at the Business, the Debtor was about 22 years old.

The Debtor typically worked alongside his father, but sometimes operated the Business on his own. Although his father kept the only key to the office, the Debtor borrowed the key when he needed to stay late or operate the Business alone. The Debtor testified that the safe typically held $10,000.00 to $15,000.00 cash on weekdays, and about $30,000.00 on weekends. Fridays saw the highest volume of business because customers generally received paychecks at the end of the week.

The Debtor frequently visited Value Bank with his father to make Business deposits and withdrawals. However, the Debtor was not a signatory on the account. The Debtor did not have access to bank statements. Value Bank allowed customers to make check deposits of under $5,000.00 via a drive-thru teller. Larger amounts needed to be deposited within the bank. When his father felt sick, the Debtor would enter the bank to deposit large checks while his father waited in the car. In such instances, both the Debtor and his father would endorse the checks. Cash withdrawn from the account was taken back to Snappy Foods and placed in the safe.

When Mr. Motaghi informed the Debtor's father that a check bounced, the Debtor often tried to collect the check in lieu of his father. The Debtor would first try and track down the customer. If the Debtor found the customer, the Debtor would try to negotiate repayment of the cash. If the Debtor was unsuccessful, the business would send the customer a demand letter. It was not clear what proportion of all bounced checks the Debtor helped collect.

In September 2017, the Debtor's father suffered a second stroke. The medical emergency left the Debtor's father unable to continue running the Business. After the stroke, the Debtor sporadically operated the Business alone, mainly on Fridays, for a period of weeks. However, by the end of September 2017, the Business closed permanently.

The September 2017 bank records from the Business account show a beginning balance of $3,832.83. It is unclear how much cash the Business held in the safe or register on that date. Four checks, totaling $26,671.83, were deposited in the account during September 2017. Two of those deposits, a $4,643.77 deposit, and a $6,249.72 deposit, appear to coincide with bounced checks from August 23 and 24, 2017. A $10,000.00 withdrawal and a $4,650.00 withdrawal were the only withdrawals made in September. The withdrawals totaled $14,672.44,[1] leaving a $15,832.22 balance at the end of the month.

No one informed Mr. Motaghi of the medical emergency. Nor was Mr. Motaghi informed when the Debtor shut the Business down. Mr. Motaghi first learned that the Business closed when he stopped by Snappy Foods and saw that the Business was not open. After discovering that the Business closed, Mr. Motaghi attempted to contact the Debtor's father to ask what happened. Mr. Motaghi was unable to reach the Debtor's father.

---

[1] That amount includes a $22.44 "Analysis Charge."

Failing to reach the Debtor's father, Mr. Motaghi contacted the Debtor. However, before reaching out to the Debtor, Mr. Motaghi discovered that only $15,832.22 remained in the account. Mr. Motaghi withdrew the remaining funds from the account on October 2, 2017. No further deposits or withdrawals were made from the account. Additionally, Mr. Motaghi could not find any logbooks or business records at the kiosk or in the office. The Debtor claims he left the logbooks at the Business on the final day of operations.

The limited funds in the account, missing logbooks, and inability to contact either the Debtor or the Debtor's father made Mr. Motaghi suspicious that the Debtor may have stolen or embezzled cash from the Business. In early October 2017, Mr. Motaghi contacted the Debtor regarding the Business. Neither the Debtor nor Mr. Motaghi recalled exactly what they discussed during that initial conversation. However, the Debtor claims that Mr. Motaghi did not accuse him of taking cash at that time. Nor did Mr. Motaghi state a specific amount of cash he believed was missing. Mr. Motaghi did communicate his belief that the Debtor owed some amount of money.

On October 9, 2017, after the Debtor failed to answer Mr. Motaghi's phone calls, Mr. Motaghi sent the Debtor a threatening text message stating "I just wanted you to remember that I tried my best to resolve this peacefully but you are choosing a different routes [sic] I can do that good luck." The Debtor testified that he felt threatened by the message because he knew Mr. Motaghi to be older, affluent, and well-connected. The Debtor agreed to meet with Mr. Motaghi in person later that day.

In preparation for the meeting, Mr. Motaghi reached out to David Torres, a retired Corpus Christi police commander. Commander Torres served in that position for thirteen years before he left the Corpus Christi Police Department in 2011. Since leaving the Department, Commander Torres has worked as a private investigator. Beginning in 2012, Mr. Motaghi regularly hired

Commander Torres to perform private investigations. Commander Torres' work for Mr. Motaghi generally involved investigating thefts at Snappy Foods locations or locating witnesses ahead of litigation.

Mr. Motaghi called Commander Torres on the phone and informed Commander Torres that money appeared to be missing from the business account. Commander Torres advised Mr. Motaghi to file a police report. Mr. Motaghi declined that advice, but invited Commander Torres to accompany him to the October 9, 2017 meeting. Commander Torres agreed to attend the meeting alongside Mr. Motaghi.

The October 9th meeting occurred at a hotel parking lot in Corpus Christi. The hotel was under construction. Mr. Motaghi and Commander Torres arrived first. While they waited for the Debtor to arrive, Mr. Motaghi told Commander Torres more details about the business, the missing money, and his belief that the Debtor took the money. At about 4:00 P.M., the Debtor arrived at the parking lot.

After parking his car, the Debtor approached Mr. Motaghi and greeted Mr. Motaghi. Mr. Motaghi introduced the Debtor to Commander Torres. Mr. Motaghi specifically told the Debtor that Commander Torres was a retired police officer.[2] Commander Torres heard the Debtor thank Mr. Motaghi for giving him a chance to repay the missing money. Commander Torres asked the Debtor what happened to the money, and the Debtor replied that he made the mistake of bringing money home from the Business, after which his girlfriend spent the money. The Debtor did not say how much money he believed his girlfriend took. Commander Torres and Mr. Motaghi insinuated that the police would be called if the money was not repaid. Because the Debtor's

---

[2] The Debtor testified that Commander Torres carried a visible firearm. Commander Torres testified that he was unarmed, and that he avoids carrying firearms in Corpus Christi because he lost an expensive firearm in a vehicle burglary. The Court accepts Commander Torres' testimony and finds that he was not armed.

girlfriend was pregnant at the time, the Debtor did not want to involve the police.  Instead, at Mr. Motaghi's suggestion, the Debtor agreed to execute a promissory note and to pledge his family home as collateral.  Commander Torres once again suggested that the police should be informed, but Mr. Motaghi appeared satisfied by the Debtor's promise.

Commander Torres and the Debtor spoke for a few minutes while Mr. Motaghi made a phone call to Michael Budd, the owner of a nearby title company.  Mr. Budd previously helped Mr. Motaghi execute about two dozen real estate transactions.  Mr. Motaghi explained the situation and asked that Mr. Budd draw up documents to memorialize the Debtor's promise to repay the money.  Mr. Budd agreed, and the parties left the hotel and headed to the title company. Commander Torres rode with Mr. Motaghi and the pair arrived first.  The Debtor drove his own vehicle and arrived about ten minutes later.[3]

At the title company, Commander Torres remained in the lobby while Mr. Budd, Mr. Motaghi, and the Debtor entered a separate room.  Mr. Budd presented the Debtor with a promissory note and deed of trust.  The promissory note required that the Debtor pay $65,000.00 over a one-year period.  The note called for twelve payments of $5,416.67, with no interest.  The Debtor's monthly income at the time was approximately $1,500.00.  Payments began on November 1, 2017, and the note matured on October 1, 2018.  The deed of trust granted Mr. Motaghi a security interest in a home, located at 3905 Keighley Crossing, Corpus Christi, Texas. The home, as explained below, was owned by the Debtor's parents and not by the Debtor.  The Debtor did not ask to read through the documents, but he was generally aware of their content. The Debtor signed both documents, and Mr. Budd notarized them.  Mr. Motaghi testified that he

---

[3] This factual record is established by the evidence.  But, the Debtor claims that he was forced into Mr. Motaghi's vehicle and driven to the title company.  The Debtor's claim was a lie.

did not pressure the Debtor to sign the documents, and Mr. Budd stated that he did not sense that the Debtor was pressured.

The original promissory note stated that it was executed in consideration of a purchase money agreement. The agreement between Mr. Motaghi and the Debtor was not a purchase money agreement. The purchase money language was included by mistake, presumably because the document was drawn up on short notice. At some point soon after the Debtor signed the original note, one of the parties caught the mistake. An amended promissory note was drafted that omitted the purchase money language, but otherwise contained the same terms. The Debtor voluntarily returned to the title company on October 10, 2017, and executed the amended note. Mr. Budd notarized the amended note. It is unclear who instructed the Debtor to return and sign the amended note. Neither Mr. Motaghi nor Commander Torres was present at the title company on October 10, 2017.

Despite executing the deed of trust, the Debtor did not own his family's home on October 9, 2017. The home originally belonged to the Debtor's father. For reasons that are uncertain, the Debtor's father transferred ownership of the home to the Debtor via a general warranty deed on April 6, 2016. However, the Debtor deeded the home back to his father, again via a general warranty deed, on August 15, 2017, nearly a month before the Business closed. The deed was not recorded until January 25, 2018, over five months after its execution. No party provided a clear explanation as to why ownership of the home was transferred to the Debtor in the first place. The Debtor suggested that after his father's first stroke, his father tended to act irrationally.

Although the Debtor did not own the home when he executed the promissory note and deed of trust, the Debtor made the November, December, and January payments under the note. Those payments totaled about $16,250.00.

Both the Debtor and Mr. Motaghi testified that about three bounced checks remained uncollected when the Business closed. After the October 9, 2017 meeting, Mr. Motaghi testified that the Debtor continued to collect those checks. Mr. Motaghi testified that the Debtor ultimately collected about $15,000.00 in returned checks after the Business closed. Those funds were never deposited in the Zeba account. As previously explained, the Debtor's entire monthly income was less than half the amount of the monthly note payment. The Court finds that the Debtor used the bounced checks he was able to collect to fund the first three note payments.

After collecting the outstanding bounced checks, the Debtor no longer had sufficient funds to make payments on the note. The Debtor defaulted on February 2, 2018. The outstanding amount owed on the note was $48,750.00 at the time of default. On April 6, 2018, Mr. Motaghi filed a notice of foreclosure on the home, and the Debtor filed for bankruptcy on April 30, 2018. This adversary proceeding followed.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

## CONCLUSIONS OF LAW

Zeba alleges that the $48,750.00 debt, evidenced by the promissory note and deed of trust, are not dischargeable under the Bankruptcy Code. The Debtor claims he did not steal or embezzle any Business funds, and that he signed the note and deed of trust under duress. The Court finds that the Debtor misappropriated $14,650.00 of cash belonging to the Business. That amount is excepted from discharge under 11 U.S.C. 523(a)(4). The Debtor executed the promissory note and deed of trust under duress because of Mr. Motaghi's overtly threatening text message and the

circumstances surrounding the October 9th meeting.  Zeba is therefore limited to a $14,650.00, unsecured, non-dischargeable claim.

A bankruptcy discharge protects the "honest but unfortunate debtor" by enabling a fresh start.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).  Public policy, however, dictates that certain debts are excepted from discharge.  Among those exceptions are debts incurred by fraudulent means.  *See Cohen v. de la Cruz*, 523 U.S. 213, 222 (1998).  Exceptions to discharge should be narrowly construed in favor of the debtor.  *Fezler v. Davis (In re Davis)*, 194 F.3d 570, 573 (5th Cir. 1999).  A creditor must show that a debt is excepted from discharge by a preponderance of the evidence.  *Grogan*, 498 U.S. at 291.

At the outset, there is no evidence that the Debtor routinely embezzled funds from the Business.  The Debtor was generally supervised by his father.  His father was always present when the pair made cash withdrawals at Value Bank.  While the Business operated, Mr. Motaghi never complained of any missing funds.  Instead, the evidence shows that the Debtor brought home the remaining cash when the Business ceased operations, and that he misappropriated that cash instead of returning it to Mr. Motaghi.

The loss of the bulk of Mr. Motaghi's initial contribution is attributable to overstated profits and uncollected bounced checks.  There is ample evidence that the Debtor's father had difficulty keeping accurate records because of his health problems, that Mr. Motaghi did not closely monitor the Business account, and that Mr. Motaghi relied on the Debtor's father's estimates when determining monthly profits.  Those facts indicate to the Court that the Debtor's father overstated the Business' profits.  Over the course of the Business, overstated profits, coupled with uncollected bounced checks, appear to have been the culprit for the bulk of the missing $80,000.00.  Without complete bank and business records, it is impossible to say exactly how much the Business lost

due to those factors.[4]   However, Mr. Motaghi's underestimation of the total number of bounced checks, and his failure to monitor whether bounced checks were ultimately collected, suggests that the Business lost substantial sums on account of uncollected bounced checks.   The Business frequently cashed checks in excess of $10,000.00.   A single bounced, but uncollected, check in that amount would nearly negate the Debtor's father's entire share of annual profits.

The Debtor played no part in causing those losses.   The Debtor was generally supervised by his father when working at the Business.   Mr. Motaghi even testified that he believes the Debtor to be of good character.   However, the Debtor did have an unsupervised opportunity to walk away with whatever cash remained on hand when the Business ceased operating.   The evidence show that the Debtor took home the cash on hand at the close of the Business, not that the Debtor misappropriated, stole, or embezzled Mr. Motaghi's entire $80,000.00 contribution.

The evidence shows that $14,650.00 was withdrawn from the account in September 2017, and that no further funds entered the account.   Nor did any checks bounce after that cash was withdrawn.   That cash is not accounted for and the account activity shows it was not paid to customers in exchange for checks.   The Court finds that the Debtor took that cash when he closed the Business.   The Court does not credit the Debtor's contention that his girlfriend took the money after he brought it home.   The Court finds that the Debtor, either alone or with his girlfriend, intentionally misappropriated $14,650.00 of Business funds.   That amount is not dischargeable under 11 U.S.C. § 523(a)(4).

The $14,650.00 amount is not reduced by the three payments, totaling $16,250.00, that the Debtor made pursuant to the promissory note.   As previously explained, the Debtor made those

---

[4] The Court notes that because the Debtor's father and Mr. Motaghi split profits evenly, Mr. Motaghi's actual loss was the 50% of overstated profits paid to the Debtor's father.  Mr. Motaghi's own share of overstated profits was effectively a return of portion of his initial contribution.

payments with money he collected from bounced checks.  The Business had a right to recover those funds from its customers.  That right is separate and unrelated to the Debtor's misappropriation.  Those checks bounced while the Business still operated, and the customers owed those amounts to the Business.  The Debtor did not collect those funds on account of the money he misappropriated, he collected them on account of ordinary business losses.  The Debtor cannot apply those amounts, already owed to the Business prior to the Debtor's misappropriation, to pay down the amount the Debtor stole.

*11 U.S.C. § 523(a)(2)(A)*

"Section 523(a)(2)(A) excepts from the discharge provisions of the Bankruptcy Code any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).  Generally, excepting a debt from discharge under § 523(a)(2)(A) requires a showing of "moral turpitude or intentional wrong."  *Id.*

The Fifth Circuit makes a distinction "between actual fraud on the one hand and false pretenses and representations on the other.  *Id.*  False pretenses and representations require a knowingly fraudulent falsehood, describing current or past facts, on which the other party relied.  *In re Holdaway*, 388 B.R. 767, 772 (Bankr. S.D. Tex. 2008).  For a debtor's representation to be a false representation or false pretense, "it must have been: 1) [a] knowing and fraudulent falsehood, 2) describing past or current facts, 3) that [was] relied upon by the other party."  *RecoverEdge*, 44 F.3d at 1292.

Actual fraud is fraud which involves moral turpitude or intentional wrong.  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).  "Actual fraud stands in contrast to implied fraud

or fraud in law, which describe acts of deception that may exist without the imputation of bad faith or immorality." *Id.* "Reckless disregard for the truth or falsity of a statement, combined with the sheer magnitude of the resultant misrepresentation" allows a court to infer an intent to deceive. *In re Miller*, 39 F.3d 301, 305 (5th Cir. 1994).

The debt in this case arose because the Debtor took cash for personal gain when the Business closed. Mr. Motaghi admits that he was unaware of this at the time because the Debtor and his father handled the Business' day to day operations. Mr. Motaghi did not even learn that the Business closed until weeks after the fact. As such, the Debtor could not have obtained the remaining cash by false pretense or false representation or actual fraud because he took the cash without Mr. Motaghi's knowledge. Section 523(a)(2)(A) necessarily requires that the creditor relied on a falsehood. Here, Mr. Motaghi was blind to the Debtor's theft until after the fact. Thus, § 523(a)(2)(A) does not except the debt from discharge.

*11 U.S.C. § 523(a)(2)(B)*

Debts obtained by the "use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive" are excepted from discharge. 11 U.S.C. § 523(a)(2)(B). Section 523(a)(2)(B) requires a statement in writing. *Id.* The debtor must have written, signed, or adopted the writing. *Heritage Bank v. McCracken (In re McCracken)*, 586 B.R. 247, 255 (Bankr. S.D. Tex. 2018).

The written statement must be materially false. 11 U.S.C. § 523(a)(2)(B)(i). Materially false statements paint "a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Nance*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987). Documents containing substantially

inaccurate information or omitting relevant information qualify as materially false statements. *McCracken*, 586 B.R. at 256.

The false statement must relate to the debtor's financial condition.   11 U.S.C. § 523(a)(2)(B)(ii).  "Financial statements that include information on a debtor's assets, liabilities, and net worth, as well as a properly-completed tax return filed with the IRS, qualify as written statements respecting the debtor's financial condition."  *McCracken*, 586 B.R. at 257 (citing I*n re Robertson*, 570 B.R. 352, 366 (Bankr. D. Utah 2017)).

Section 523(a)(2)(B)(iii) demands that the creditor reasonably relied on the false writing. "[T]he creditor must have actually relied on the written statement, and that reliance must have been reasonable."  *Id.* (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)).   A creditor need not rely solely on the false writing.  *See In re Slonaker*, 269 B.R. 595, 606 (Bankr. N.D. Tex. 2001).  Courts look at the totality of the circumstances to determine the fact question of whether a creditor's reliance was reasonable.  *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993).

Finally, the debtor must have made the false writing with an intent to deceive the creditor. 11 U.S.C. § 523(a)(2)(B)(iv).  Courts must look at the totality of the circumstances to determine whether the writing was knowingly false or made with a "[r]eckless disregard for the truth or falsity of [the] statement combined with the sheer magnitude of the resultant misrepresentation. . . ." *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 482 (5th Cir. 2009).  If a creditor shows the debtor possessed knowledge of the false statement, the debtor may testify regarding his honest intent.  *McCracken*, 586 B.R. at 259.  The debtor's unsupported testimony refuting his intent to deceive requires that the court make a credibility determination.  *Id.*

Zeba argues that because the Debtor did not own his family home when he executed the note and deed of trust, the debt evidenced by the promissory note is nondischargeable under § 523(a)(2)(B).  However, the Debtor signed those documents after the funds were stolen.  No loss was suffered by Zeba based on the false premise that the home was owned by the Debtor.  It advanced no funds when the Debtor executed the promissory note and deed of trust.  Mr. Motaghi merely sought to ensure that the Business' losses would be repaid.

Moreover, the debt was incurred under duress.  In Texas, duress occurs when "(1) there is a threat to do something which a party threatening has no legal right to do; (2) there is some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection."  *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex. App.—Dallas 1987).  Elements one and two are similar and require a showing that a party "threatened to do something he had no legal right to do, and that threat involved an illegal exaction or a fraudulent deception."  *McCallum Highlands, Ltd. v. Washington Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995).  Further, when a party possesses:

> the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, against the will of such party through fear of injury to his business or property interests, such threats amount to duress if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

*Dale v. Simon*, 267 S.W. 467, 470 (Tex. Com. App. 1924).

The Debtor executed the note and deed under duress.  Prior to the October 9th meeting, Mr. Motaghi threatened the Debtor via text message, stating "I tried my best to resolve this peacefully but you are choosing a different route[]."  The end of the "peaceful route" implies the start of the violent route.  *See Nichols v. Ill. Dep't of Transp.*, 152 F. Supp. 3d 1106, 1117 (N.D.

Ill. 2016) ("Yet after taking this peaceful approach and peacefully serving a one-day suspension for a rule infraction he believed was manufactured against him, he still was met upon return to work with another threat that he was going to be 'f[***]ed up.'").  The Debtor understandably approached the October 9th meeting afraid of what might occur if he refused to capitulate to Mr. Motaghi's demands.

The Court has carefully considered the testimony of each of the participants in the hotel meeting.  The meeting occurred in an empty hotel parking lot.  That location, combined with the threatening text message, elevated the Debtor's fear regarding what might occur at the meeting. That fear heightened even further once the Debtor arrived and discovered that Mr. Motaghi brought a former police commander to the meeting.  Mr. Motaghi's text message implying violence set an apprehensive stage for the meeting.  The Debtor then found himself in an ominous location, outnumbered and confronted by a pair of older individuals, including a former police officer.  The Debtor was understandably scared.

Importantly, at the meeting, Mr. Motaghi informed the Debtor that if he would not cooperate, Mr. Motaghi would involve the police and file a criminal complaint.  Commander Torres's presence made that threat of criminal prosecution very real.

To further ensure repayment, Mr. Motaghi urged the Debtor to sign the promissory note and deed of trust.  While the Debtor did not own his family home, he reasonably feared what Mr. Motaghi might do if he did not agree.

The first two elements of duress are satisfied here.  Mr. Motaghi had no legal right to resolve the dispute via a route that was not "peaceful."  Yet Mr. Motaghi threatened to do so.  Nor did Mr. Motaghi have a legal right to force the Debtor to sign a deed of trust or promissory note. While Mr. Motaghi did have a right to inform the police that he believed money had been stolen,

Mr. Motaghi had no right to threaten the Debtor or demand that the Debtor use his family home as collateral for the missing funds. Mr. Motaghi improperly used his threats to obtain a security interest in the Debtor's home.

As a matter of law, the threat of criminal prosecution to collect a debt creates duress in Texas. *F.D.I.C. v. White,* 76 F. Supp. 2d 736 (N.D. Tex. 1999) ("The threat of criminal prosecution may constitute duress whether or not the threatened party is actually guilty of a crime."); *Greene v. Bates,* 424 S.W.2d 5, 9 (Tex. Civ. App.—Houston 1968, no writ). The court in *Greene* succinctly stated:

> It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due, or to coerce the making of contracts or agreements from which advantage is to be derived by the party employing such threats. Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different purpose, and cannot be employed to interfere with that wise and just policy of the law that all contracts and agreements shall be founded upon the exercise of the free will of the parties, which is the real essence of all contracts.

*Greene*, 424 S.W.2d at 9 (quoting *Hartford Fire Ins. Co. v. Kilpatrick*, 111 Ala. 456, 466 (1896)).

Texas law appears to be settled that duress imposed by a threat of criminal prosecution removes the free will necessary to form a contract. *Weinberg v. Baharav,* 553 S.W.3d 131 (Tex. Civ. App.—Houston 2018).

Noteworthy for the situation presented to the Court, the threat of a criminal prosecution can vitiate a transfer of an interest in real property. *In the Matter of Marriage of Lopez*, No. 14-18-00797-CV, 2020 WL 4523594 (Tex. App. Aug. 6, 2020) (voiding quitclaim deed in a marital dispute). The Court sees no reason why a deed of trust against a home would be treated any differently under Texas law.

The third element is satisfied because the Debtor did not have free agency to resist Mr. Motaghi's efforts.  Because of the text message, the location of the meeting, and Commander Torres' presence, the Debtor feared what might happen if he resisted Mr. Motaghi.  Although the Debtor was responsible for $14,650.00 the missing funds, Mr. Motaghi accused him of taking $65,000.00.  The Debtor reasonably feared that his mother, his ill father, or his pregnant girlfriend might suffer consequences if he did not do as Mr. Motaghi asked.

Mr. Motaghi did far more to create a coercive atmosphere on October 9th.  Mr. Motaghi made an unveiled threat of violence, and then expressed his desire to leave the police out of it.  As a result, the Debtor felt he had no choice but to do as Mr. Motaghi suggested.  The note and deed were signed under duress.[5]

Additionally, the analysis does not change because the Debtor returned to the title company to sign amended documents on October 10th.  Mr. Motaghi personally knew the Debtor, as well as the Debtor's family.  The Debtor was just as afraid to cross Mr. Motaghi on October 10th as he was on October 9th.

The Court does not make its duress determination without difficulty.  As the Court previously alluded, the Debtor's testimony concerning the October 9th meeting was replete with falsehoods.  According to the Debtor, he arrived at the hotel parking lot at some point after 3 p.m.  As he approached Mr. Motaghi, Commander Torres intercepted him and identified himself as an officer of the law.  In the Debtor's recollection, Commander Torres was visibly armed.  He testified

---

[5] Because the Debtor's signature was obtained under duress, the note and deed are invalid.  The Debtor raised duress as a defense to § 523(a)(2)(B), but did not specifically argue that the note and deed are invalid.  A finding that the note and deed are invalid may not be necessary to determine that the debt does not meet the requirements of § 523(a)(2)(B).  However, the Court finds that the parties tried the validity of the note and deed by consent because both parties recognized the issue.  *See* Fed. R. Civ. Pro. 15(b); *Villegas v. United States*, 124 F.3d 193 (5th Cir. 1997) ("[T]rial by consent requires that the parties actually recognize the issue to have been litigated.")  The issue was substantially litigated by the parties, and justice dictates that the Court determine the effect of the duress.

that Commander Torres and Mr. Motaghi forced the Debtor into the backseat of Mr. Motaghi's car and drove the Debtor to the title company. The Debtor felt forced to sign the note and deed because he was intimidated and uncomfortable by Commander Torres' firearm. The Debtor further testified that he had no choice but to sign the documents. Finally, the Debtor stated that he never returned to the title company and did not sign the amended documents on October 10th.

The Debtor embellished or lied about the events of October 9th and 10th. His testimony directly conflicted with Mr. Motaghi and Commander Torres' recounting of the October 9th meeting. Commander Torres explained that he does not routinely carry a firearm in Corpus Christi. Both Commander Torres and Mr. Motaghi testified that the Debtor drove his own vehicle to the title company. Mr. Budd verified that the Debtor arrived after Mr. Motaghi and Commander Torres. Further, the amended note and deed were notarized on October 10th and Mr. Budd credibly testified that he never postdates his notary signature. This contradicts the Debtor's testimony that he did not return to the title company on October 10th. Thus, the Court places limited weight on the Debtor's testimony about the events of October 9th and 10th.

Given the Debtor's lack of candor, the Court is hesitant. Had the Debtor testified truthfully, the Court's decision would be straightforward. By sensationalizing the meeting under oath, the Debtor called into question whether he truly was under duress when he signed the note and deed. However, the Court must apply the credible facts to the law. The circumstances, as described by Mr. Motaghi and Commander Torres, demonstrate duress for the reasons stated above.

The Court in no way condones the Debtor's behavior. Mr. Motaghi was wrong to pursue repayment in the manner in which he did and the Debtor was wrong to take the money and lie under oath. The Debtor's behavior was reprehensible and he must repay the money he misappropriated. However, Mr. Motaghi accused the Debtor of stealing a far greater sum of

money.  The evidence shows that the Debtor agreed to repay money which he did not take under duress because Mr. Motaghi threatened and intimidated him.

Because the Debtor executed the promissory note and deed of trust under duress, those documents cannot form the basis of a debt excepted from discharge under § 523(a)(2)(B).  Without an enforceable promissory note or deed of trust there is no writing evidencing the debt to Mr. Motaghi.  Nor is there a writing concerning the Debtor's financial condition.

*11 U.S.C. § 523(a)(4)*

Debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are excepted from discharge by § 523(a)(4).  Section 523(a)(4) excepts three types of debts from discharge: 1) debts incurred by fraud or defalcation where the debtor was a fiduciary; 2) debts incurred by embezzlement; and 3) debts incurred by larceny.  *See Holdaway*, 388 B.R. at 774.  No fiduciary relationship is necessary for the second and third categories.  *See id.*

Embezzlement under § 523(a)(4) is defined by federal law.  *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006) (citing *In re Hayden*, 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000)).  Embezzlement is a "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).  The fraudulent appropriation must be of another's property.  *Davenport*, 353 B.R. at 199.  Fraudulent intent is an intent to deceive.  *Id.* at 200.  Fraudulent intent is inferred from the debtor's conduct, as well as the surrounding circumstances.  *In re Harrell*, 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988).  Appropriation involves exercising control over or taking possession of property.  *Davenport*, 353 B.R. at 200.

The Debtor embezzled $14,650.00 of funds from the Business, and that amount is excepted from discharge under § 523(a)(4).  The Debtor was employed by his father to run the Business.

Thus, the Debtor was entrusted to handle Business cash and checks.  Despite that trust, when he shut down the Business, the Debtor took home the remaining $14,650.00 of cash.  That cash did not belong to the Debtor.  The Debtor knew that that cash did not belong to him.  Instead of returning that cash to Mr. Motaghi, the Debtor, possibly along with his girlfriend, kept the cash. The Debtor's actions support a finding that he appropriated another's property with fraudulent intent.  *See In re Harrell*, 94 B.R. at 91.  For that reason, the $14,650.00 debt is excepted from discharge.

*11 U.S.C. § 523(a)(6)*

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C.  §  523(a)(6). Nondischargeability under § 523(a)(6) requires a deliberate or intentional injury, not just a deliberate or intentional act leading to injury.  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). "[A]n injury is willful and malicious where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).  A subjective motive to harm involves "acting with the desire to cause injury." *Guerra & Moore, Ltd. v. Cantu (In re Canto)*, 400 B.R. 104, 108 (Bankr. S.D. Tex. 2008).  Malice exists when a debtor acts "with the actual intent to cause injury."  *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003).

As previously discussed, the Debtor embezzled the final cash remaining in the safe at the end of the Business.  The Court will not determine whether the conduct was willful and malicious. Based on the § 523(a)(4) finding above, that determination is moot

CONCLUSION

A separate judgment will be entered.

SIGNED 05/14/2021

Marvin Isgur
United States Bankruptcy Judge